```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

------------------------------X
                              :
UNITED STATES OF AMERICA,     :
                              :     13-MJ-171
        v.                    :
                              :     February 26, 2013
MOHAMMED CHOWDRY,             :
                              :     Brooklyn, New York
             Defendant.       :
                              :
------------------------------X


        TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
           BEFORE THE HONORABLE JOAN M. AZRACK
              UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

For the Government:          LORETTA LYNCH, ESQ.
                             UNITED STATES ATTORNEY
                             BY: SAM NITZE, ESQ.
                             ASSISTANT U.S. ATTORNEY
                             271 Cadman Plaza East
                             Brooklyn, New York  11201


For the Defendant:           JOSHUA DRATEL, ESQ.



Audio Operator:


Court Transcriber:           ARIA SERVICES, INC.
                             c/o Elizabeth Barron
                             102 Sparrow Ridge Road
                             Carmel, NY 10512
                             (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1              THE CLERK:  Case number 13-MJ-171, United
 2   States v. Mohammed Chowdry.
 3              Counsel, please state your names for the
 4   record.
 5              MR. NITZE:  Sam Nitze for the government.
 6   Good afternoon, your Honor.
 7              THE COURT:  Good afternoon.
 8              MR. NITZE:  Here with Special Agent
 9   Christopher Hecht (ph).
10              MR. DRATEL:  Good afternoon, your Honor.
11   Joshua Dratel for Mr. Chowdry.
12              THE COURT:  Agent Hecht, do you swear to the
13   truth of your complaint?
14              AGENT HECHT:  Yes, ma'am.
15              THE COURT:  Mr. Dratel, have you reviewed
16   the complaint with your client?
17              MR. DRATEL:  Yes, your Honor.
18              THE COURT:  Mr. Chowdry, do you understand
19   what the charges are?
20              THE DEFENDANT:  Yes.
21              THE COURT:  Do you want a preliminary
22   hearing for him?
23              MR. DRATEL:  Yes, your Honor.
24              THE CLERK:  Two weeks from today is March
25   12$^{th}$ at 11:00.
```

1          THE COURT:  What's the government's position
2    on bail?
3          MR. NITZE:  Your Honor, the government's
4    position is that the defendant presents a significant
5    danger and should be held in custody.
6          MR. DRATEL:  Your Honor, we are seeking
7    bail.  He's been in the United States since 1994.  He
8    has permanent resident status.  His son, who is a
9    citizen, is here, as well as a family friend.  He also
10   has three other children in the U.S., who are all
11   citizens.
12         The family has a house that it lives in, but
13   it's in the son Shaquil's (ph) name.  It has about
14   $150,000 worth of equity.  Mr. Chowdry is a taxi driver
15   in New York City, his son is a taxi driver in New York
16   City.  And they in fact have a medallion as well.
17         The pretrial report recommends bail.  I
18   think the Court can set a reasonable bail, with
19   whatever conditions are necessary.  Mr. Shaquil Chowdry
20   has his father's passport with him now.  He can
21   surrender it right now.
22         This is a case I think that is ultimately a
23   family dispute.  There are some other factors that I
24   think will prove unrelated, that right now may appear
25   to be related but are not related.

```
 1                THE COURT:  What would those be?
 2                MR. DRATEL:  That the homicides are in any
 3   way related to Mr. Chowdry.  I mean, this is -- your
 4   Honor, from the little internet research I did from the
 5   time I was contacted two or three hours ago and coming
 6   here, on the internet -- (ui) second most violent city
 7   in Pakistan next to Kurachi.  It has a murder rate the
 8   equal of Colombia, the country.
 9                Also, what I learned as well, not on the
10   internet but I learned from just a rudimentary
11   investigation in literally a couple of hours is that
12   the cousin whose family was victimized is someone who
13   is a fugitive from Dubai, was arrested and deported
14   from Dubai, is in Pakistan under an assumed name and
15   has a criminal past of some significance.
16                THE COURT:  Wait, the sister or the father?
17                MR. DRATEL:  There is a person who is
18   referred to in this complaint as a cousin, and I don't
19   know if it's really a blood relative but I'm using the
20   term cousin for purposes of identification here.  It's
21   paragraph 4, where it says that the daughter --
22                THE COURT:  Yeah.
23                MR. DRATEL:  -- Amin Ajmal (ph) --
24                THE COURT:  Right.
25                MR. DRATEL:  That's her last name -- escaped
```

1  from Dubai with the assistance of a cousin.  That
2  cousin is the person with the criminal record.  That
3  cousin's father and sister are the homicide victims.
4  This is something that's been going on for eight weeks
5  now.
6           That she returned to the United States and
7  discussions about what's going to happen in terms of
8  family and what she's going to do -- there is a wealth
9  of recorded conversations, and my understanding is
10 that, with the exception of the one allegation here,
11 there's no other allegation of anything untoward heard
12 in any of the other conversations.
13          And that this claim of three years of
14 confinement in Pakistan is simply absurd.  She was
15 married in a public, religious ceremony with a thousand
16 guests, in October of 2012.
17          THE COURT:  Getting back to paragraph 4,
18 there aren't many interpretations of the February 20th
19 and 23rd consensually recorded conversations.  And then
20 coincidentally, they happen to be murdered?
21          MR. DRATEL:  Your Honor --
22          THE COURT:  You're saying it's just a random
23 act of violence in a very violent province, or it's
24 this cousin who's related to organized crime.
25          MR. DRATEL:  What I'm saying is, the

1  inference is -- I understand the inferences.  I'm not
2  blind to --
3             THE COURT:  These are words that came out of
4  your client's mouth.
5             MR. DRATEL:  I understand.
6             THE COURT:  It's not as if we have somebody
7  else on the phone and we're saying, attribute that to
8  my client.  These are --
9             MR. DRATEL:  I understand.
10            THE COURT:  -- according to the government,
11 recorded conversations in which your client is making
12 these threats.
13            MR. DRATEL:  I understand.  What I'm saying
14 is that the connection is merely an inference, and that
15 there are other inferences that can be drawn.  And
16 merely on the basis of that --
17            THE COURT:  But I don't know how reasonable
18 those other ones are under these circumstances.
19            MR. DRATEL:  Well, I think that this
20 inference is based on --
21            THE COURT:  Somebody threatens something if
22 something doesn't happen, it doesn't happen, and then
23 that act is carried out.
24            MR. DRATEL:  I understand the inference.
25            THE COURT:  In a very short time period.  So

```
 1   the fact that -- the time period in and of itself makes
 2   the inference stronger.
 3              MR. NITZE:  If I may, your Honor, I might be
 4   able to flesh out --
 5              THE COURT:  Maybe you can assist me.  You
 6   probably know more about this than me.  I just know the
 7   complaint.
 8              MR. NITZE:  I think to describe it as a
 9   family dispute is, while in one sense accurate, I think
10   kind of significantly understates the gravity of what's
11   going on here.  But just to address a couple of points:
12              First, with respect to the homicides in
13   Pakistan, the person who reported to the police and
14   witnessed the homicides was the wife of this cousin --
15   excuse me, the mom of the cousin.  The cousin who
16   helped the defendant's daughter escape from her
17   confinement --
18              THE COURT:  Yeah.
19              MR. NITZE:  I'll return to this confinement
20   question in a moment -- and who was being punished for,
21   I don't know, disgracing the family's honor, it is his
22   mother who witnessed her husband and child murdered.
23   Our understanding is she identified the defendant's
24   brother as one of the shooters.  The defendant's
25   brother is the uncle of the defendant's daughter, who
```

```
 1  kept her in confinement.
 2              Now, I suppose reasonable minds can disagree
 3  about how much -- what kind of conduct is covered by
 4  the word confinement, but she was kept without a cell
 5  phone, access to the internet, and was not allowed to
 6  leave the home without an escort of one kind or
 7  another.  Ultimately, the marriage was performed, I
 8  suppose in a public ceremony, but that was after
 9  threats were issued on her life.
10              There's more I could say but I'll leave it
11  there.  I think the inferences to be drawn from the
12  murders that happened soon on the heels of these
13  threats are one directional.
14              MR. DRATEL:  This is all untested.  I mean,
15  this is really third and fourth-hand information, so I
16  don't know what level of --
17              THE COURT:  It's not third hand.
18              MR. DRATEL:  I'm not going to dispute what
19  Mr. Nitze is saying because, obviously, he had
20  information.  But we're talking about information which
21  -- I'm just concerned about the reliability of it,
22  frankly.
23              THE COURT:  This isn't a situation where we
24  don't have your client, or allegedly have your client
25  making statements, making threats in a consensually
```

1  recorded telephone call, and then those threats are
2  carried out because what he says is supposed to happen
3  didn't happen.  And then we have a witness, albeit in
4  Pakistan, who says, I observed the murders.
5          Is that what you're saying?
6          MR. NITZE:  That is my understanding, that
7  the witness identifies his brother as involved in the
8  shooting.
9          THE COURT:  I mean, if this was just plain
10 vanilla immigration fraud, your client would be out on
11 the suggested bond, you know, five minutes ago.  But
12 this isn't and --
13         Did you have something else?
14         MR. NITZE:  Just to add that this
15 information is coming from a police report that was
16 written up in Pakistan through the U.S. Consulate.  It
17 was sent to us from the U.S. Consulate.  It's obviously
18 possible for a police report to contain erroneous
19 information, but that's just the source of our --
20         THE COURT:  And is Ajmal in the United
21 States at this time?
22         MR. NITZE:  Yes.
23         THE COURT:  This is not a plain vanilla
24 immigration fraud case.  I've never had a case like
25 this come before me, where unfortunately for your

1  client, right now, everything points in his direction.
2  The inferences -- the only reasonable inferences to
3  draw in these circumstances are that your client is
4  exactly as he's portrayed in this complaint, which is
5  someone who was behind, in some fashion, these murders
6  and this confinement and the crime charged.
7             So, unfortunately, what you have proposed is
8  not sufficient, given these facts.  So I'm going to
9  deny your application.  I think your client is a risk
10 of flight and I think he's also a danger to the
11 community.
12            MR. DRATEL:  Thank you, your Honor.
13            THE COURT:  You have your preliminary
14 hearing date.
15            Is there anything else?
16            MR. NITZE:  Not from the government, your
17 Honor.
18            THE COURT:  Anything else?
19            MR. DRATEL:  Just I know the agents have
20 (ui) of Mr. Chowdry's, so just to make sure that that
21 goes with him.
22            THE COURT:  They know what to do.  Okay.
23                  *  *  *  *  *  *  *  *
24
25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18      I certify that the foregoing is a correct
19   transcript from the electronic sound recording of the
20   proceedings in the above-entitled matter.
21
22
23   [signature]
24
25   ELIZABETH BARRON                        April 17, 2013
```