EMN:AH/MG/RMT
F.#2013R00312

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        13 CR 150 (S-1) (WFK)

MOHAMMAD AJMAL CHOUDHRY,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTION TO ADMIT CERTAIN
EVIDENCE AGAINST THE DEFENDANT AT TRIAL

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Amanda Hector
Richard M. Tucker
Margaret Gandy
Assistant U.S. Attorneys
(Of Counsel)

PRELIMINARY STATEMENT

The defendant Mohammad Ajmal Choudhry is charged in a three-count superseding indictment ("Indictment") with conspiracy to commit murder in a foreign country, visa fraud, and transmission of threats over the telephone.   The government respectfully submits this memorandum of law in support of its motions in limine to admit at trial: (1) relevant video evidence; (2) statements of multiple co-conspirators regarding the conspiracies to restrain his daughter Amina's ability to leave Pakistan, to force her to marry a man against her will, to fraudulently file visa paperwork on Amina's behalf, and to threaten the lives of, and eventually to locate and murder, members of the family of the man who ultimately helped Amina leave Pakistan; (3) evidence of certain uncharged acts of the defendant; and (4) statements expressing intentions to perform certain future acts.

For the reasons set forth below, the evidence that the government seeks to introduce at trial is admissible and highly relevant, and the probative value of the evidence far outweighs any potential prejudice to the defendant.

STATEMENT OF FACTS

The defendant is charged in the Indictment with conspiracy to commit murder in a foreign country, in violation of 18 U.S.C. § 956(a)(1) ("Count One"), visa fraud, in violation of 18 U.S.C. § 1546(a) ("Count Two"), and transmission of threats over the telephone, in violation of 18 U.S.C. § 875(c) ("Count Three").   The charges stem from the defendant's actions following his daughter Amina's refusal to acquiesce to her father's demands concerning her marriage to an arranged spouse, and her subsequent flight from Pakistan to the United States, after which her

father orchestrated the murder of family members of Shujat Abbas ("Shujat"), the individual he blamed for his daughter's disobedience.   Trial is scheduled for June 16, 2014.

The government will establish the following facts, among others, at trial through witness testimony as well as documentary and other evidence.[1]

A.  The Choudhry Family

Amina Ajmal ("Amina") immigrated to the United States in approximately 1999 at the age of nine and became a naturalized United States citizen in 2009.   Amina's mother died when Amina was a child in Pakistan.   In the United States, Amina resided in Brooklyn, New York along with her father, the defendant, and multiple other relatives who, at times, also resided at the Choudhry family home in Brooklyn.   On occasion, Amina would visit her relatives in Pakistan and attend family celebrations, such as weddings.   The Choudhry family also owned a large home in Chiryawala, Pakistan, where many of Amina's relatives resided and where she would stay when visiting Pakistan.   Since she was approximately 8 years old, Amina understood that she was "promised" to Abrar Ahmed Babar ("Babar"), a Pakistani national living in Pakistan, in marriage, and would wed him when she became older.

B.  Amina Is Taken to Pakistan by the Defendant Under False Pretenses in 2009

In 2009, at the approximate age of 19, Amina was residing in Brooklyn with the defendant and attending Brooklyn College.   In late 2009, Amina asked her father for permission not to marry Babar and instead to marry Shujat Abbas, a Pakistani national whom she had met years earlier and with whom she had been engaging in a long-distance romantic relationship.   The defendant was initially resistant to Amina marrying Shujat.   However, in November 2009, the

---

[1]      Any statements attributed to individuals in the recitation of facts are set forth here in sum and substance and in part.

2

defendant appeared to acquiesce, telling Amina that they would travel to Pakistan together to attend the marriage of Amina's cousin and, while there, the defendant would make arrangements to break off Amina's engagement to Babar and arrange for her to marry Shujat.

Shortly after arriving in Pakistan in November 2009, however, Amina learned that the defendant neither intended to permit her to marry Shujat, nor to permit her to return to the United States for the foreseeable future.   Rather, following Amina's cousin's wedding, the defendant left Amina at the Choudhry family home in Pakistan in the custody of his brother, Muhammad Akmal Choudhry ("Akmal"), and other relatives, and returned to the United States. The defendant told Amina that she would remain in Pakistan until she married Babar and sponsored him for a U.S. visa.   For the next approximately three years, Amina remained in Pakistan against her will under the supervision of the Choudhry family, including Akmal.   During this time, Amina continued to engage in frequent, albeit covert, communications with Shujat.

Also during this time, Amina expressed her desire not to marry Babar, and to return to the United States, to various members of her family.   Eventually, Amina realized the futility of her protests concerning the marriage and concluded that she would be able to return to the United States only following her marriage to Babar.   In approximately November 2012, Amina married Babar.   After the ceremony, Amina moved into Babar's residence.   Soon thereafter, Amina learned that she would not be permitted to return to the United States until she was pregnant with Babar's child.   At that point, Amina resolved to find a way to return to the United States without her family's permission.

C.  Fraudulent Visa Application for Babar

Shortly after her marriage to Babar, while Amina was still living in Pakistan, Amina was told by her brother Shakeel Choudhry ("Shakeel") that the family was now filing the

3

application for Babar's visa to the United States.   In furtherance of this plan, Shakeel called

Amina from the United States and asked Amina whether she had any passport-style photographs

of herself at the family home in Brooklyn.   On December 1, 2012, an immigrant visa petition

("visa petition") listing Amina as the petitioner and Babar as the relative beneficiary was mailed

from Brooklyn, New York to United States Citizenship and Immigration Services, part of the

Department of Homeland Security.   The visa petition bore the purported signature of Amina and

listed the defendant's residence in Brooklyn as Amina's residence since 2008.[2]   As of the time the

visa petition was mailed, however, Amina was living in Pakistan and had not been in the United

States for several years.   In a consensually recorded conversation between Amina and the

defendant on February 21, 2013, the defendant admitted that he was the person who filed the visa

petition on behalf of Babar.

      D.   <u>Amina's Escape from Pakistan</u>

On the evening of January 3, 2013, with assistance from Shujat and the U.S. State

Department, Amina fled Pakistan and returned to the United States.   Because Amina's and

Babar's families both suspected that Amina and Shujat were engaged in a romantic relationship,

they immediately began efforts to locate Shujat in order to find Amina.   Amina's disobedience

and flight from Pakistan were viewed by the defendant and other members of the Choudhry family

both in Pakistan and in the United States as a source of great shame and dishonor.   As a result, the

defendant and others, including family members and associates of the Choudhry family, launched

a campaign of threats and violence against the Abbas family with the objective of forcing Amina to

return home and to hold Shujat accountable for the dishonor that he had brought upon the

Choudhry family.   Other than Shujat, the Abbas family includes Shujat's sisters Madeeha

---

[2]     The government anticipates that Amina will testify that she neither completed nor signed
any visa paperwork on behalf of Babar.

("Madeeha"), Seemab ("Seemab") and Nayab ("Nayab"), Shujat's father Asghar ("Asghar") and his mother Rukhsana ("Rukhsana").   In addition to the defendant, who at times delivered direct threats to members of the Abbas family, multiple other family members of the defendant were also involved in delivering threats and ultimatums to members of the Abbas family, both during in-person meetings and over the telephone.   These individuals included Akmal, Javed Iqbal ("Javed") and Mazhar Iqbal ("Mazhar"), both of whom are sons-in-law of Akmal,

E. The January 26, 2013 Ambush

Approximately three weeks after Amina's flight from Pakistan, on January 26, 2013, Asghar and Rukhsana were in the town of Bernala, Pakistan attending a family funeral. That afternoon, Shujat's father Asghar received a call from Akmal and Javed, two of the defendant's relatives, which occurred over a speaker phone.   During that call, Akmal and Javed instructed Asghar to return to Chiryawala immediately, because they needed to talk with him. They further told Asghar that if he did not return in two hours, his entire family would be murdered.   Asghar agreed and thereafter began the journey back to Chiryawala along with Rukhsana in the family's SUV.   As Asghar and Rukhsana drove along the route to Chiryawala, they were ambushed by Akmal, Mazhar and other family members and close associates of the Choudhrys, some of whom opened fire on the SUV.   Ultimately, Asghar and Rukhsana were able to escape unharmed, but the SUV was hit by several bullets.

Following the ambush, members of the Abbas family received direct threats from members of the Choudhry family, including Akmal, Javed and the defendant.   In certain of those communications, members of the Choudhry family claimed responsibility for the ambush and threatened further violence if Amina did not return home.

5

F.  The February 25, 2013 Murders

Following the January 26 ambush, Amina, who was now in hiding in the United States, began to make a series of consensually recorded telephone conversations with the defendant.  During those calls, the defendant repeatedly threatened that he and those under his direction would kill Shujat and members of the Abbas family if Amina did not return to the family home in Brooklyn.

For example, on February 21, 2013, the following call was recorded between Amina and the defendant:

| | |
|---|---|
| Choudhry: | Just come back before something happens. |
| Amina: | What will you do? |
| Choudhry: | I will kill one of their men. |

\* \* \*

| | |
|---|---|
| Amina: | What will you do? |
| Choudhry: | I will kill each and every one of them. |
| Amina: | But why?  I have told you they have nothing to do with this.  I came here on my own. |
| Choudhry: | Oh yeah . . . Now let me make it clear to you.  If you don't come back, I will kill each and every one of them.  I and the entire family will be held.  We will end up in jail. |

\* \* \*

| | |
|---|---|
| Amina: | If I come back home, will you still do it? |
| Choudhry: | Oh no, if you come back home, then we are saved.  If you don't come back, then there is only death. |
| Amina: | Okay, I will call back again. |

\* \* \*

6

| Choudhry: | Think it over with a cool mind.   I have sworn on your mother. No one will touch you.   Wipe this thought from your mind.   Just come back as soon as you can. |
| Amina: | Okay. |
| Choudhry: | Tell me your decision tonight. |

Four days after the defendant's ultimatum to Amina to return home or he "will kill each and every one of them," on February 25, 2013, Shujat's father and sister, Asghar and Madeeha, were murdered in broad daylight in Chiryawala.   Members of the Abbas family came upon the scene of the murders immediately following the shootings.   Abbas family members witnessed Akmal, as well as other close associates and relatives of the defendant, standing over the bodies, poking them with the barrels of their rifles, and heard Akmal announce that the shooting was his family's revenge against the Abbas family.

On that same day, February 25, 2013, the defendant was arrested outside his home in Brooklyn.   Following his arrest, the defendant made several inculpatory statements with respect to the charged crimes.   With respect to the murders, the defendant stated "I might have said if you don't come home I'll kill the boy" and that Akmal "might have been" at the scene of the shooting of Shujat's relatives in Pakistan earlier that day.   With respect to Babar's visa application, the defendant stated that "I filed that paper, I filed that paper.   I want a good life over here."   The defendant added that, in his opinion, if he could get Babar to the United States and reunite him with Amina without Shujat's presence, then Amina would change her mind and live happily with Babar, as her other sisters had done in the United States with their arranged spouses.

<u>ARGUMENT</u>

At trial, to prove the charged offenses, the government anticipates offering 1) video evidence demonstrating the defendant's co-conspirators' access to the type of firearms used to murder Asghar and Madeeha; 2) the statements of multiple of the defendant's co-conspirators made in furtherance of the conspiracies to restrain Amina's ability to leave Pakistan, to force her to marry Babar against her will, to fraudulently file visa paperwork on Amina's behalf, and to threaten the lives of, and eventually to locate and murder, members of the Abbas family; 3) evidence of certain prior acts committed by the defendant; and 4) testimony of Witness #1 and Witness #2 regarding the stated future intentions of murder victim Asghar.   For the reasons set forth below, all of the proposed evidence is admissible and highly relevant, and the probative value of the proposed evidence far outweighs any potential prejudice to the defendant.

A.   The Proposed Video Evidence Constitutes Direct Evidence of the Charged Crimes, as well as Relevant Background Evidence Demonstrating the Relationship Between Co-Conspirators

The government intends to introduce at trial portions of three video recordings that depict members of the Choudhry family and others participating in customary wedding celebrations in Chiryawala, Pakistan in 2001 and 2007, respectively.   The first video, which is labeled, "ch jamil afzal,chiryawala,kotla,gujrat," depicts a large gathering of men dancing while musicians perform in celebration of a family wedding that took place in 2001 at the Choudhry family home in Chiryawala.   Specifically, the video depicts Akmal, Afzal and other Choudhry family members intermittently dancing to the music.

The second and third videos, which are labeled "ch khalilafzalwedding, banghra&firing.chiryawala,kotla,hujrat.part1" and "ch khalilafzalwedding, banghra&firing.chiryawala,kotla,hujrat.part-2" likewise depict a large gathering of men dancing

8

and throwing money in celebration during a family wedding that took place in 2007 at the Abbas family home in Chiryawala, Pakistan. The videos also depict Akmal and other Choudhry family members firing guns into the air in apparent celebration. The defendant is not depicted in any of these videos.[3]

The reasons that the government seeks to introduce these videos are threefold. First, the government seeks to offer the videos as proof of the relationships that exist between Choudhry family members, several of whom are unindicted co-conspirators of the defendant, including Akmal. Second, the videos will familiarize the jurors with the Abbas and Choudhry family homes in Pakistan, and some of the customary practices surrounding wedding celebrations in Pakistan, which will afford the jury some context for the testimony they will hear regarding events that took place in each home, as well as Amina's wedding in 2012 and the attendant events. Third, the second video offers proof of Akmal's access to a firearm in Pakistan and will be corroborative of the anticipated testimony from witnesses that they have seen Akmal in possession of a similarly appointed firearm at times relevant to the charged conspiracy.

1. Applicable Law

Generally, relevant evidence should be precluded only if its probative value is substantially outweighed by the risk of unfair prejudice, or another enumerated risk. Fed. R. Evid. 403. Evidence is relevant if "it has a tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the

---

[3]     Attached as Exhibit A is a copy of the videos referenced herein.

9

charges can have that tendency."   United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).

Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of

the crime."   Id.; see also Fed. R. Evid. 401, 402.   Indeed, as the Supreme Court has recognized, in

analyzing the admissibility of evidence, the trial court should make its determinations "with an

appreciation of the offering party's need for evidentiary richness and narrative integrity in

presenting a case."   Old Chief v. United States, 519 U.S. 172, 183 (1997).

2.   Analysis

The videos that the government seeks to admit are both relevant and highly

probative of issues that will be presented at trial.   To begin, each of the videos offers proof of the

familial relationships between the co-conspirators, as well as visual evidence of people and places

in Pakistan that will be discussed by witnesses at the trial: namely, Akmal and the Abbas and

Choudhry family homes.   In addition, each of the videos offers visual evidence of the customary

wedding practices that will be relevant to the testimony of Amina, whose own arranged marriage

ceremony in Pakistan included the customary celebrations depicted in the videos.

Because the videos will allow the jury to visualize people, locations and customary

practices that will be the subject of testimony from the government's witnesses, and are likely

unfamiliar to most jurors in the Eastern District of New York, the probative value of the videos is

high.   The videos also offer the kind of "evidentiary richness and narrative integrity" that the

Supreme Court has recognized is significant to a party's ability to effectively present a case and

should therefore be considered when determining the admissibility of evidence at trial.   Id.

The probative value of the second video is particularly high, in that it offers direct

evidence of Akmal's access to and prior use of a firearm in Pakistan.   The government intends to

elicit testimony at trial that Akmal owned a firearm that he kept in the Choudhry family home in Chiryawala, and that he was seen holding a firearm on the day of the murders while standing over the bodies of the Abbas family members who were killed, and using the firearm to prod their bodies.   Accordingly, the second video is particularly relevant to what the government anticipates will be a disputed issue of fact at trial – whether Akmal participated in the murders of Asghar and Madeeha – and is highly probative of his ability to have done so.   Furthermore, the risk of unfair prejudice to the defendant is exceedingly low, as neither video depicts the defendant and the second video depicts Akmal and other Choudhry family members firing the weapon in celebration, and not under circumstances that are suggestive of criminality.

B.   The Statements of Multiple Co-Conspirators Regarding Charged and Uncharged
     Conspiracies Are Admissible At Trial

At trial, the government anticipates that Amina and members of the Abbas family will testify regarding statements made by the defendant and co-conspirators of the defendant in furtherance of the defendant's conspiratorial objectives to restrain Amina's ability to leave Pakistan and to force her to marry Babar.   For example, the government expects that Amina will testify that she was threatened by Akmal with violence if she did not acquiesce in the marriage to Babar, and further that Akmal indicated that such threats were sanctioned by the defendant.   Amina is also expected to testify regarding her brother Shakeel's statements to her seeking passport photographs for the purpose of submitting Babar's visa paperwork.   The government also anticipates that members of the Abbas family will testify regarding statements and threats made to them by the defendant and co-conspirators of the defendant in furtherance of the defendant's conspiratorial objectives to force Amina to return home, to coerce the Abbas family to provide information regarding her location, and ultimately to locate and murder Abbas family members.   Notably, the

11

government further expects a member of the Abbas family to testify that, in the context of delivering these threats, the defendant's co-conspirators at times explicitly indicated that the threats were being delivered on the defendant's behalf and, on at least one occasion, put the defendant on the telephone with him/her to deliver a threat himself.

        1.    <u>Applicable Law</u>

        a.  <u>Co-conspirator statements</u>

Rule 801(d)(2)(E) provides in relevant part that "[a] statement . . . is not hearsay [if] . . . the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy."   A statement comes within this Rule if there was a conspiracy whose members included the declarant and the party against whom the statement is offered, and the statement was made during the course of and in furtherance of the conspiracy.   <u>See, e.g.</u>, <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987).   Further, the person to whom the statement is made need not be a co-conspirator, so long as the statements were meant to prompt the listener to respond in a way that promoted or facilitated the goals of the conspiracy.   <u>See</u> <u>United States v. Beech-Nut Nutrition Corp.</u>, 871 F.2d 1181, 1199 (2d Cir. 1987).

      Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive.   The requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy."   <u>United States v. Rivera</u>, 22 F.3d 430, 436 (2d Cir. 1994).   Thus, co-conspirator statements may be found to be "in furtherance" of the conspiracy if they "prompt the listener to respond in a way that facilitates the carrying out of criminal activity."   <u>United States v. Rahme</u>, 813 F.2d 31, 35 (2d Cir. 1987).   For

instance, in <u>Beech-Nut</u>, the Second Circuit upheld the admission of co-conspirator statements that "were designed to 'cover up'" a criminal conspiracy.   871 F.2d at 1199.

Moreover, "[i]t is settled law that the conspiracy which serves as the vehicle for the introduction of [a co-conspirator statement] need not be charged in the indictment."   <u>United States v. Lyles</u>, 593 F.2d 182, 194 (2d Cir. 1979) (citing <u>United States v. Olweiss</u>, 138 F.2d 798, 800 (2d Cir. 1943) (admission of co-conspirator statements "does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal")); <u>see also</u> <u>United States v. Stratton</u>, 779 F.2d 820, 829 (2d Cir. 1985) ("It is not necessary that the government charge a conspiracy to take advantage of Rule 801(d)(2)(E)."); <u>United States v. Ellis</u>, 156 F.3d 493, 497 (3d Cir. 1998) (holding that statements made by co-conspirators may be admissible regardless of whether they were made in a conspiracy separate from that charged).   This is because, when two people enter into a joint venture of a conspiratorial nature, the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other, and thus admissible against a defendant, "regardless of whether the objective of the joint venture is the crime charged in the indictment (or the objective of the conspiracy charged in the indictment)."   <u>United States v. Russo</u>, 302 F.3d 37, 45 (2d Cir. 2002).   Thus, in order to be admissible, "[t]he government merely needs to demonstrate that the declarant and the defendant against whom the statements are offered are members of a conspiracy in furtherance of which the statements are made," and that the conspiracy that serves as the basis for admission of the statements is "'factually intertwined' with the offenses being tried."   <u>Stratton</u>, 779 F.2d at 829; <u>see also</u> <u>United States v. Abouhalima</u>, 201 F.3d 432, 1999 WL 1295846, at *2 (2d Cir. Dec. 23, 1999) (holding that "the government may

13

seek to introduce statements in furtherance of an uncharged conspiracy so long as the conspiracy is 'factually intertwined' with the offense being charged"); United States v. Barnes, 604 F.2d 121, 156 (2d Cir. 1979); Lyles, 593 F.2d at 194.[4]

### b.   Statements Against Penal Interest

Where a declarant is unavailable, statements made against a person's penal interests are admissible under Federal Rule of Evidence 804(b)(3).   Rule 804(b)(3) excepts from the hearsay rule a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to . . . criminal liability" and, if offered in a criminal case as one that tends to expose the declarant to criminal liability, "is supported by corroborating circumstances that clearly indicate its trustworthiness."   Fed. R. Evid. 804(b)(3).   The rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson v. United States, 512 U.S. 594, 599 (1994).   "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context" and "[t]hus, this determination must be made on a case-by-case basis."   United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) (citations omitted).   Notably, the proffered statement "[need] not have been

---

[4]      Indeed, the Second Circuit has held that, for the purpose of admitting co-conspirator statements, "the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all."   Russo, 302 F.3d at 45 (citing Christopher B. Mueller and Laird C. Kirkpatrick, 4 Federal Evidence § 426 (1994) ("The exception can apply even if the proponent does not show that the venture is unlawful."))   Ultimately, "[a]dmissibility depends on the nature of the statement offered – in particular what objective it sought to advance – and whether the defendant was jointly engaged with the declarant in a conspiracy seeking that objective."   Russo, 302 F.3d at 46.

sufficient, standing alone, to convict [the declarant] of any crime," so long as it would have been "probative" in a criminal case against him.   United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011).

        If the district court finds that the statement is against the declarant's penal interest, it must then determine whether there are corroborating circumstances indicating it's trustworthiness.   United States v. Gupta, 2014 WL 1193411, at *13 (2d Cir. Mar. 25, 2014) (internal quotations omitted).   Further, "the inference of trustworthiness from the corroborating circumstances must be strong, not merely allowable."   United States v. Salvador, 820 F.2d 558, 561 (2d Cir. 1987).   Similarly, courts have held that if the statement incriminates both the declarant and the defendant in a criminal case, the court must determine if there are corroborating circumstances indicating the declarant's trustworthiness.   United States v. Saget, 377 F.3d 223, 230 (2d Cir. 2004) ("[A] statement incriminating both the declarant and the defendant may possess adequate reliability if . . . the statement was made to a person whom the declarant believes is an ally, and the circumstances indicate that those portions of the statement that inculpate the defendant are no less reliable than the self-inculpatory parts of the statement."); United States v. Taylor, No. 10 CR 268 (DLI), 2014 WL 1653194, at *8 (E.D.N.Y. Apr. 24, 2014) (admitting statements of a co-defendant that implicated both the co-defendant and the defendant in criminal activity where the co-defendant's "statements were made to a cellmate, whom he was unaware was acting as an agent for the government").

        2.    Analysis

        The testimony the government seeks to admit falls squarely within Rule 801(d)(2)(E).   First, with respect to statements made by the defendant's co-conspirators in

furtherance of the defendant's plan to restrain Amina's ability to return to the United States and to force her to marry Babar against her will, the defendant's objective – while not charged as a federal crime in this case – and his participation in the plan nevertheless constitutes a conspiracy that is "factually intertwined" with the charged offenses and appropriately serves as the basis for admission of co-conspirator statements.   See Stratton, 779 F.2d at 829; Abouhalima, 201 F.3d at *2.   In fact, it is difficult to conceive of a conspiracy more "factually intertwined" with the defendant's conspiracy to murder the Abbas family than the conspiracy whose failure motivated the murders – i.e., it was the Choudhrys' failure to successfully force Amina to obey their directives that ultimately resulted in their decision to murder innocent members of the Abbas family.   The factual overlap of the two conspiracies is further supported by the fact that some of the same individuals who conspired with the defendant to restrain and force Amina to marry against her will were also members of the conspiracy to murder members of the Abbas family.

Second, Shakeel's statements to Amina seeking her passport photographs for the purpose of submitting Babar's visa paperwork were made in furtherance of the defendant's objective to fraudulently file visa paperwork bearing Amina's forged signature, as charged in Count Two of the Indictment, and are thus admissible as co-conspirator statements.

Third, statements made by the defendant's co-conspirators in Pakistan in furtherance of the conspiracy to threaten the lives of, and ultimately to locate and murder, members of the Abbas family are admissible because they were made in furtherance of crimes charged in the Indictment.   Here, the defendant is charged both with the transmission of threats to injure Shujat and other members of the Abbas family in the time period leading up to the February 25, 2013 murder of Madeeha and Asghar (Count Three), as well as participation in a conspiracy to

16

murder members of the Abbas family between January 2013 and February 2013 (Count One). The conspiracy charge also alleges four overt acts, which include telephone calls and a money transfer to some of the defendant's co-conspirators, including Akmal, Javed, Mazhar and Nisar Ahmed, Babar's father.   As such, the statements of the defendant's co-conspirators – to threaten the lives of, deliver ultimatums to, and to cause the victims to be in particular locations at particular times to facilitate both the attempted murders of Asghar and Rukhsana on January 26, 2013 and the ultimate murder of Asghar and Madeeha on February 25, 2013, were all made during and in furtherance of the charged crimes and thus are admissible pursuant to Rule 801(d)(2)(E).

Alternatively, many of the proffered statements – in particular, those in which co-conspirators deliver threats to injure and/or murder Amina and/or members of the Abbas family – are independently admissible as statements against penal interest pursuant to Rule 804(b)(3). The witnesses who delivered the statements, including Akmal, Javed, and Mazhar, are unavailable and the statements themselves constitute admissions that could subject those co-conspirators to criminal liability.[5]   Moreover, corroborating circumstances, including telephone records showing

---

[5]      Pursuant to Federal Rule of Evidence 804(a), a declarant is considered to be unavailable as a witness if the declarant (1) is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies; or 2) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony.   Here, the declarants are foreign nationals who are not subject to the government's subpoena power.   See United States v. Al Fawwaz, No. 98 CR 1023, 2014 WL 627083, at *1 (S.D.N.Y. Feb. 18, 2014) ("Foreign witnesses who are not subject to the government's subpoena power and, despite the moving party's appropriate efforts, refuse to travel to this country to testify routinely are found unavailable.").   Additionally, the government has not made efforts to request that these witnesses travel to the United States because the witnesses' participation in serious crimes, as detailed herein, is inconsistent with granting such witnesses permission to travel to the United States.   In addition, assuming arguendo that these witnesses were eligible for visas, given their criminal exposure, the witnesses would likely assert the Fifth Amendment privilege if called to testify.   See United States v. Johnson, 581 F.3d 320 (6th Cir. 2009) (upholding district court determination on unavailability where court found that

communications between the defendant and certain of these individuals in the time periods surrounding key events, as well as the accounts of eyewitnesses to the January 26 ambush and the February 25 murder scene, will be presented by the government at trial.   With respect to any instances in which the co-conspirators' statements also implicate the defendant himself, additional corroborating circumstances strongly support the trustworthiness of the statements.   In particular, the consensually recorded statements of the defendant to his daughter are fully consistent with the defendant's shared desire to threaten and murder the Abbas family, and the co-conspirators had no reason to exaggerate or misreport the defendant's shared feelings.

For the above-stated reasons, the government respectfully requests that this Court permit the government to admit the types of statements detailed herein as either or both co-conspirator statements and/or statements against penal interest.

C.      Evidence of A Prior Act of the Defendant Is Admissible At Trial

At trial, the government intends to introduce a series of recorded conversations between the defendant and Amina made between February 15, 2013 and February 25, 2013.   In the recordings, the defendant repeatedly threatens to murder members of the Abbas family and delivers ultimatums to Amina that, if she failed to return home, he would follow through on his threats.   Notably, in two recordings, in the context of threatening Amina, the defendant mentions a prior instance in which he ordered individuals in Pakistan to fire shots against individuals who accused him of being unable to control his daughter Tasneem, Amina's sister.   In addition to introducing the defendant's recorded statements on this subject, the government also intends to

---

unavailability requirement was satisfied because of the likelihood that the witness would invoke the Fifth Amendment).

elicit testimony from Amina to explain the background and context of the defendant's reference to the incident involving Tasneem.

This evidence, which is further described below, is admissible on several grounds: first, it constitutes direct proof of the crimes charged in the Indictment, and second, it provides essential background and context and is inextricably intertwined with the charged crimes.

1. The Defendant's Reference to the Prior Act and Amina's Proffered Testimony

In a recorded telephone conversation on February 15, 2013, the defendant stated the following:

> I have been humiliated previously too, both over here, and there.   This is the second time, and now I find no purpose in life to live any longer.

During a recorded telephone conversation one week later, on February 21, 2013, the defendant again referenced this prior instance of "humiliation" in the context of delivering the following threat:

> I have been humiliated before here, and don't want it to happen again.   The last time I had a fight with [U/I] was because they taunted me that I can't find my women.   You know about that fight don't you? . . . . I had firings done on them three times, and I am still not going to leave them.   Whenever I get a chance, I will kill them.

During this same conversation, the defendant delivered an ultimatum to Amina, explaining that "if you don't come back [home], then there is only death," and asking that Amina "think it over with a cool mind" and give the defendant her decision that night.   At trial, the government expects Amina to testify that, with respect to the statements regarding "firings done on them three times," the defendant was referring to a prior incident in which his daughter (and Amina's sister) Tasneem left the family home in Brooklyn to be with a man who was not her intended, pre-arranged spouse.

19

Shortly thereafter, the defendant took the family to Pakistan where Tasneem was married to her pre-arranged spouse, Jamil Choudhry, who is also the defendant's nephew.   The government further expects Amina to testify that, when the defendant stated "I had a fight with [U/I] . . . because they taunted me that I can't find my women," he was referring to the fact that an individual[s] taunted him about Tasneem's attempt to avoid her arranged marriage and, in retaliation, he had individuals in Pakistan shoot at that person's home on three occasions.

> 2. The Recording and Proffered Testimony is Admissible Because It is Direct Proof of Count Three of the Indictment, Provides Crucial Background and Context to the Charged Crimes and Is Inextricably Intertwined with Evidence of the Charged Crimes

The Second Circuit has repeatedly held that evidence of uncharged criminal activity is admissible when it constitutes either intrinsic or direct poof of the charged crimes.   See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000).   Although, in this case, the evidence at issue directly establishes an element of the offense of transmitting threats over the telephone, even if proposed evidence does not directly establish an element of a charged crime, it is nonetheless admissible if it provides necessary background for the events involved in the case. United States v. Skowronski, 968 F.2d 242, 246 (2d Cir. 1992); see also United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (holding that uncharged criminal activity, wrongs, or other acts are not considered "other crimes" evidence that must satisfy Rule 404(b)'s requirements "if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial").   In particular, "evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."   United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994); see also Carboni, 204 F.3d at 44 (holding evidence of uncharged crime admissible

"if it is necessary to complete the story of the crime on trial"); <u>Gonzalez</u>, 110 F.3d at 942 (evidence of attempted burglary occurring around same time as charged felon-in-possession crime was admissible as "crucial background evidence that gave coherence to the basic sequence" of the charged crime); <u>see also</u> Weinstein's Federal Evidence 404.20[2][c] (evidence of other acts "is admitted if it contributes to an understanding of the event in question, even if it reveals crimes other than those charged, because exclusion under those circumstances would render the testimony incomplete and confusing.").

    Here, the defendant's statements are direct evidence of his commission of the crime of transmitting threats over the telephone – in fact, the statements themselves constitute the crime. The defendant's reference to his prior willingness and ability to have individuals in Pakistan fire shots at other individuals in retaliation for a perceived insult about the defendant's ability to control his daughter Tasneem is, itself, the communication of a threat to Amina.   By reminding Amina of this prior event, the defendant intended to impart his willingness to act similarly with respect to the Abbas family.   Thus, the statements themselves – among others of the defendant's during the recorded calls -- constitute the crime charged.   As such, the statements are admissible as direct evidence.   <u>Carboni</u>, 204 F.3d at 44.[6]

---

[6]  Moreover, in order to prove Count Three, "the government must show a 'true threat,' one that 'on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.'" <u>United States v. Sovie</u>, 122 F.3d 122, 125 (2d Cir. 1997) (quoting <u>United States v. Kelner</u>, 534 F.2d 1020, 1027 (2d Cir.1976)). "The test is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [threat] would interpret it as a threat of injury." <u>United States v. Malik</u>, 16 F.3d 45, 49 (2d Cir.1994) (internal quotation marks and citation omitted) (interpreting 18 U.S.C. § 876, companion statute to Section 875(c) that proscribes threats mailed via U.S. Postal Service).   The defendant's specific reference to his prior actions with respect to Tasneem constitutes both direct evidence of the "true" nature of the defendant's threat as well as the "gravity of purpose and imminent prospect of execution," as

21

In addition to being direct evidence of the charged crime, the defendant's statements are also both "inextricably intertwined with the evidence regarding the charged offense[s]" of both transmission of threats over the phone and conspiracy to commit murder, as well as necessary to "complete the story of the crime [on] trial" and provide necessary background and context. Towne, 870 F.2d at 886. The defendant's reference to the prior incident involving his daughter Tasneem, and his subsequent efforts to shoot at an unnamed individual who taunted the defendant about his inability to control his "women," as well as his continued, unabated desire to kill those individuals when the opportunity arose, was intended to impart upon Amina both the seriousness of the defendant's threats, and also his ability to carry out his threats in Pakistan from afar.[7]

---

well as Amina's justifiable interpretation of the defendant's statements as a threat of injury.

[7]     In the alternative, the proffered evidence is also admissible pursuant Federal Rule of Evidence 404(b) because it demonstrates the defendant's intent, motive and capacity to commit the charged crime of conspiracy to commit murder abroad.   Here, the government anticipates that the defendant will argue that, despite his recorded threats, he did not actually intend to kill any members of the Abbas family and that, instead, other individuals with independent motives to kill the Abbas family capitalized on the Choudhry-Abbas family dispute by killing members of the Abbas family knowing that the Choudhrys would likely be blamed.   In that case, the defendant's admission that he, in fact, previously used violence in response to a perceived affront to his honor and didn't "want it to happen again," is admissible to show that the defendant actually intended to harm the Abbas family, i.e. that his threats were not the mere ramblings of a distraught father. See, e.g., United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) (noting that "prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged").   Similarly, in addition to proving intent, the defendant's statement also rebuts any claim that the defendant was not motivated to use violence in response to his perceived humiliation or lacked the authority or ability to cause others to commit violent acts on his behalf in Pakistan.   United States v. Zedner, 401 F.3d 36, 49-50 (2d Cir. 2005), rev'd on other grounds, 126 S. Ct. 1976 (2006); United States v. Laflam, 369 F.3d 153, 156-57 (2d Cir. 2004).

D.      The Statements of Witness #1 and Witness #2 Regarding the Stated Intentions of Victim Asghar Abbas Are Admissible Under Federal Rule of Evidence 803(3)

The government also moves to admit under Rule 803(3) of the Federal Rules of Evidence statements by multiple witnesses that certain individuals, including one of the murder victims, expressed intentions to perform certain future acts.   Such declarations of intent are admissible at trial.

1.      Pertinent Facts

The government expects to elicit the following facts.   Witness #1 is expected to testify that:

- On February 25, 2013, at approximately 11 or 11:30 am, Asghar informed Witness #1 that he planned to meet with member(s) of the Choudhry family at a local member of parliament's house.

- On February 25, 2013, at approximately 12:45 pm, Asghar informed Witness #1 that he intended to pick up his daughter Madeeha at school when she was finished.

Witness #2 is expected to testify that:

- On the evening of January 3, 2013, Asghar received a phone call.   Thereafter, Asghar told Witness #2 that he was going to Mazhar's house to meet with Mazhar and Akmal at their request.

2.      Legal Standard

Under Rule 803(3), a statement is not excluded by the prohibition on hearsay if it is:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

Pursuant to this rule, a statement of intent to carry out a plan is admissible to prove that the declarant thereafter acted in accordance with the stated plan or intent.   See Mutual Life Ins. Co. of

23

<u>New York v. Hillmon</u>, 145 U.S. 285, 295-96 (1892); <u>see also</u> Fed. R. Evid. 803 Advisory

Committee Note to Paragraph (3) (1972)   ("The rule of <u>Mutual Life Ins. Co. v. Hillmon</u>, 145 U.S.

285 . . . allowing evidence of intention as tending to prove the doing of the act intended, is . . . left

undisturbed."); <u>United States v. Best</u>, 219 F.3d 192, 198 (2d Cir. 2000).

         3.     <u>Analysis</u>

         The above-described statements that the government expects to elicit regarding the

stated intentions of Asghar will be offered to show that he acted in accordance with the stated plan

or intent.   For example, Asghar's statements on January 3, 2013 regarding his plan to go to

Mazhar's house to meet with Mazhar and Akmal will be offered to show that Asghar took steps in

accordance with those stated plans, <u>i.e.</u>, that he drove to Mazhar's house thereafter.   Pursuant to

<u>Hillmon</u> and Rule 803(3), the statements of future intent made by Asghar should be admitted at

trial for these purposes.

24

CONCLUSION

For the reasons set forth above, the government's pretrial motions should be granted.

Dated:      Brooklyn, New York
              May 28, 2014

                               Respectfully submitted,

                               LORETTA E. LYNCH
                               United States Attorney
                               Eastern District of New York


By:   /s/Amanda Hector
                               Amanda Hector
                               Richard M. Tucker
                               Margaret Gandy
                               Assistant U.S. Attorneys